**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **MARTHA SHINDOLL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 4:15-CV-759** |
| | § | |
| **UNITED OF OMAHA LIFE** | § | |
| **INSURANCE COMPANY,** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT UNDER ERISA
FOR RECOVERYOF DISABILITY INSURANCE BENEFITS**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, Martha Shindoll, and files this *Complaint Under ERISA for Recovery of Disability Insurance Benefits.* In support thereof, Plaintiff would respectfully show the Court as follows:

## I.   PARTIES

1. Martha Shindoll ("Shindoll" or "Plaintiff") is an individual who currently resides in Collin County, Texas.

2. Defendant United of Omaha Life Insurance Company ("MoO" or "Defendant") is a Nebraska corporation with its principal office and place of business in Omaha, Nebraska. MoO may be served through its registered agent for service of process, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## II.   JURISDICTION AND VENUE

3. This Court has jurisdiction over this action for violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(e)(1). Venue is proper in the United States

District Court for the Eastern District of Texas, Sherman Division, because the unlawful practices alleged below were committed therein.

### III. FACTS

**A. Plaintiff was previously a highly capable Software Applications Engineer, Senior Manager in the telecommunications field.**

4. Plaintiff had a lengthy and successful career in the information technology sector. XO Communications hired Plaintiff as a project manager in 2000. She quickly established herself as a go-to resource and was promoted to manager within the year. In 2004 she was promoted again, this time to Software Applications Engineer, Senior Manager. In this role, Plaintiff was responsible for leading and managing people in understanding, documenting and delivering the complete "system development life cycle" as new products roll out, and when upgrades are made to existing systems. The position carried with it massive responsibility, and Plaintiff continued to excel in this role as well. Plaintiff continued to receive "outstanding" and "consistently exceeds expectations" performance ratings as senior manager, and she was frequently praised for successfully partnering with clients to meet XO's business challenges.

**B. Plaintiff is diagnosed with Chronic Fatigue Syndrome and Fibromyalgia.**

5. In 2005, Plaintiff was diagnosed with Chronic Fatigue Syndrome (CFS) and Fibromyalgia. Both conditions were disabling, as they substantially limit Plaintiff in several major life activities. Plaintiff was able to continue working throughout this time under her doctor's close supervision, and she achieved remission in 2007. From 2007 through 2011 Plaintiff was symptom-free.

6. However, in late 2010 Plaintiff began a project at work that would ultimately span nineteen months and result in two near-complete team turnovers. In the end, Plaintiff was the only team member to make it through the entire effort. She begged for assistance during this time but none

was given. She was required to not only manage the upgrade but also her other projects that were also pending during this time.

7. By September 2011 Plaintiff began to experience high levels of pain associated with CFS and Fibromyalgia. She revisited her treatment regimen with her physician, and her supervisor allowed Plaintiff to telecommute on Fridays and as-needed on other days of the week in order to manage her symptoms. In the midst of the upgrade, XO went through a reorganization. Plaintiff's responsibilities increased by an additional thirty percent and she was assigned a new supervisor. In October 2012, XO made it clear that the company expected Plaintiff and her team to work nights and weekends, and that her new supervisor did not support any further telecommuting by Plaintiff beyond one day per week at most. Plaintiff's condition continued to deteriorate. She returned to her doctor on November 16, 2012, and he recognized that Shindoll had relapsed, and ordered her off work immediately. Shindoll applied for and was granted FMLA leave and commenced intense treatment to get her symptoms under control. At the end of twelve weeks of FMLA leave, Plaintiff was still not capable of returning to work on the terms dictated by XO, and her leave was extended by thirty days.

8. Plaintiff was not ready to return to work at the end of her leave, but XO insisted that she return. Plaintiff requested an accommodation in the form of a thirty-two hour workweek and full-time telecommuting through May. XO granted the request and she returned to work duties on March 18, 2012. It was nearly impossible for Plaintiff to work, even working only 32 hours a week, and completely from home. Two days later, Plaintiff was told that her position had been eliminated and that she was therefore terminated.

**C. Plaintiff is forced to apply for short-term disability benefits with Mutual of Omaha.**

9. MoO issued a Group Long Term Disability Insurance Policy (No. GUD-0AI3Y) to XO with an effective date of January 1, 2012 (the "Policy").  MoO serves as both the insurer and the administrator under the Policy.

10. During her time at XO, Plaintiff was the beneficiary under a short-term and long-term disability benefits policy with MoO.  Prior to her termination, Shindoll applied for short-term disability benefits under the policy.  By letter dated December 17, 2012 MoO initially denied Plaintiff's application for benefits.  On July 1, 2013, through counsel, Plaintiff appealed MoO's adverse decision.  MoO's December 17, 2012 decision denying an award of benefits was reversed, and Plaintiff began receiving disability benefits.

**D. MoO's determination awarding benefits was inexplicably reversed on March 5, 2015.**

11. By letter dated March 5, 2015, however, MoO notified Plaintiff that her benefits would be discontinued effective February 23, 2015.  In its March 5, 2015 correspondence, MoO made the following observations:

- Plaintiff's previous job as a Software Apps Engineer, Sr. Manager is considered a sedentary occupation.
- Plaintiff experiences frequent headaches resulting from medication overuse.
- There is no evidence of muscle pain, tenderness, weakness, or impaired range of motion.
- There is no evidence of bacterial or viral infections, documentation of cognitive problems by appropriate testing, or support for any of the restrictions and limitations claimed by Dr. Kippells.
- Plaintiff endorses an "incredible" number of somatoform symptoms with unsupported diagnoses without documentation of any disease or disorder.
- Plaintiff has an "unspecified" anxiety disorder, and this anxiety did not prevent Shindoll from completing any activities of daily living or general functioning at home.
- There is no evidence of cognitive or impaired psychological functioning or functional disturbances that would prevent Plaintiff from performing the Material Duties of her Regular Occupation beyond February 23, 2015.

12. MoO's conclusions were based entirely on the unsupported opinions of physicians on MoO's payroll who never treated Shindoll, or its paid "independent" physician who evaluated

Plaintiff only once. Their conclusions were diametrically opposed to the conclusions reached by Plaintiff's treating physician, a physician Plaintiff consulted for a second opinion, a neuropsychologist that Plaintiff also consulted with, and a Licensed Professional Counselor Plaintiff consulted with as well.

### E. MoO's reversal of benefits was in error.

13. XO's disability benefits policy provides as follows:

> Disability and Disabled means that because of an Injury or Sickness, a significant change in Your mental or physical capacity has occurred in which You are: (a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and (b) unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

14. MoO determined that no further benefits are payable because Plaintiff does not satisfy the policy's definition of "Disability and Disabled," and because she has not provided satisfactory proof of continuous disability as required by the policy. This was nonsense. MoO's definition of "disabled" had not changed since its decision that she was in fact "disabled" within the meaning of the policy, nor had Ms. Shindoll's diagnoses of Fibromyalgia and Chronic Fatigue Syndrome. There had been no change in circumstance on Plaintiff's part that would lead MoO to a good faith determination that she was somehow no longer disabled.

15. Dr. Kenneth Kippels, Plaintiff's main treating physician, has remained actively involved in her treatment. His examinations are the standard of care in the diagnosis and treatment of Chronic Fatigue Syndrome and Fibromyalgia, and are supported by the published literature on these illnesses.

16. On June 12, 2015, Shindoll obtained a second opinion from Dr. William Spurlock, another physician who focuses his practice on the treatment of Fibromyalgia and Chronic Fatigue Syndrome. As Dr. Spurlock explains, there is no procedure for the diagnosis of Fibromyalgia other

than the "Trigger Point" testing along with an exploration of the patient's history. Dr. Spurlock considered Dr. Kippels' most recent administration of the Trigger Point exam, and noted that the testing revealed 15 out of 18 positive trigger points. The diagnosis of Fibromyalgia is reached with a minimum of 12 out of 18 positive trigger points. Dr. Spurlock repeated the Trigger Point test, and his results reflected that Shindoll exhibited 17 out of 18 positive trigger points, easily confirming Dr. Kippels' diagnosis of Fibromyalgia. Dr. Spurlock also noted that Shindoll exhibited short-term memory loss, which is also associated with Fibromyalgia and Chronic Fatigue Syndrome.

17. Although MoO took issue with Dr. Kippels' evaluation and treatment of Shindoll, it never referred her records to a physician with actual experience with either Fibromyalgia or Chronic Fatigue Syndrome. Dr. Spurlock found that Dr. Kippels' testing and treatment of Shindoll has been complete and state of the art. He further found that his diagnostic evaluations have been appropriate and he has followed prescribed protocols utilized by leaders in the field and Fatigue Centers of America for aiding these patients. In short, he found no fault in Dr. Kippels' treatment and evaluation processes.

18. In fact, Shindoll continues to experience severe cognitive impairment, which is consistent with Fibromyalgia. In the Spring of 2013, Dr. Kippels gave Shindoll the Rey-Osterrieth Complex Figure Test, which is a neuropsychological assessment of immediate recall, or "short-term memory." Shindoll's results showed progressively less detail and more errors than what would be expected of those without cognitive impairments resulting from Fibromyalgia. She lost 30 percent of the detail immediately after viewing the graphic, and 60 percent after 20 minutes. This is significantly more short-term memory loss than one might expect in someone not suffering cognitive deficits resulting from Fibromyalgia. She has related specific incidents to Dr. Kippels

that are consistent with one suffering cognitive defects related to Fibromyalgia and Chronic Fatigue Syndrome. She has also related major memory problems to Dr. Kippels as well. Frequently, Ms. Shindoll is unable to remember and/or follow sequence of steps or instruction. She is often confused, unable to complete tasks, and unable to multi-task. She continues to experience impaired concentration, diminished attention span, and impaired speed of performance.

19. Shindoll's cognitive impairment, including memory problems, insomnia, and physical pain are all consistent with a continuing diagnosis of Fibromyalgia. On account of her Fibromyalgia, Shindoll's ability to sit, stand, and walk is highly variable. On days when she is highly symptomatic, she is more or less bedridden all day and she can barely sit, stand, or walk. On days when she is mildly symptomatic, Shindoll is able to sit, stand, and walk for approximately six hours combined. On extremely good days, which are rare, Shindoll can do so for up to eight hours. On these days, however, Shindoll's activities are limited to basic self-care and basic daily activities. Her ability to do this is highly variable; if she is able to sit, stand, and walk around for six to eight hours a day, she needs anywhere from one day to one week of rest afterwards. Even on days when she is mildly symptomatic, Shindoll cannot sit or stand for more than thirty minutes at a time. When mildly symptomatic, Shindoll cannot walk for more than thirty minutes per day, and only a few minutes at a time when she is highly symptomatic.

20. These circumstances foreclose all employment opportunities to Shindoll, even so-called "sedentary work." As Dr. Kippels explained to MoO:

> Ms. Shindoll is unable to continue in the employment she maintained at XO, or any other full-time position. This includes positions that are considered 'sedentary,' as these positions involve sitting most of the time, which Ms. Shindoll cannot do for prolonged periods of time with any consistency. In fact, sedentary positions can be worse than active jobs for people with Fibromyalgia, because of the hip and shoulder pain associated with the disease. These positions would also generally require Ms. Shindoll to exert up to 10 pounds of force on occasion or a minimal amount of force frequently

      to lift, carry, push, pull or otherwise move objects, including the human body. Ms. Shindoll is limited in the activities of lifting and carrying, use of hands in repetitive actions, use of feet in repetitive movements, repetitive bending, and reaching above shoulder level. As set forth above, even on days when she is mildly symptomatic, Ms. Shindoll cannot sit or stand for more than 30 minutes at a time, and no more than 2 hours per day. This would preclude her from holding positions considered sedentary.

    21. Setting aside Shindoll's physical limitations, sedentary work is not possible for Shindoll in light of her chronic and debilitating cognitive dysfunction. According to Dr. Kippels, Shindoll's position with XO and any other similar occupation would require a high level of analysis, and management of competing deadlines and projects. With her challenges with tasks, speed, and multi-tasking, these occupations would be impossible for Shindoll to hold. Dr. Spurlock agreed, based on Shindoll's cognitive impairment. As he explained, "[t]he brain is the major factor in sedentary positions, and her lacking executive function and short-term memory loss render her incapable of holding these positions. The pain syndrome is also distracting, which leads to more errors. She is unable to maintain a sitting position for longer than one hour. She requires lying down on a regular basis, which is inconsistent with the work world. Ms. Shindoll is disabled from her previous job, and any sedentary full-time job as well."

    22. Over July 1-2, 2015, Shindoll underwent intense neuropsychological testing by Dr. Nancy A. Didriksen, PhD. Dr. Didriksen reached the following material conclusions, among others:

- Neurocognitive test results are generally consistent with self-report of dysfunction as well as consistent with the diffuse effects of her illnesses on cognitive functioning.
- Her Impairment Index of 0.6 … indicates that she is impaired over several cognitive domains.
- Ms. Shindoll's performance on the Wechsler Adult Intelligence Scale-III is also below expectation, considering prior academic and occupational achievements.
- Demographically-adjusted scores also indicate low-average verbal comprehension abilities, attention to detail, and visual sequencing and planning abilities, as well as mildly-impaired long-term memory and retention of a general fund of information from education and experience.

- Academic abilities appear compromised to some degree as well. … She reported a prior strength in mathematics, yet committed errors on several rather easy computations, suggesting inattention, consistent with self-report of committing frequent errors at the present time.

23. In summary, Dr. Didriksen opined that Shindoll's prognosis is fair to good because of her "strong desire to regain her health and return to gainful employment. However, at the present time her mild impairment of brain-related abilities, overall memory deficits, poor attention to detail, and decreased overall intellectual functioning, in additional to severe fatigue and pain, argue most strongly against return to work in **any** workplace setting, now and in the foreseeable future. She is unable to sustain mental energy over time (conation) which also strongly argues against return to work."

24. Dr. Carl E. Hansen, a Licensed Professional Counselor and LPC-approved supervisor, shared the conclusion reached by Drs. Kippels, Spurlock, and Didriksen. Dr. Hansen received his Bachelor of Arts degree in 1963 in the field of Major Audiology and Speech Correction. He received a M.Ed & Ed.S. in 1965 in Rehabilitation Counseling. In 1968 he received a Ph.D. in Rehabilitation Counseling. Dr. Hansen worked as a professor at the University of Texas at Austin from 1968 through 1995, where he served as the Director of the Rehabilitation Counselor Education Program for 15 years, Chairman of the Department of Special Education for 7 years, and Director of the Job Readiness Clinic for 16 years. Dr. Hansen's relevant experience also includes 2 years working as a Rehabilitation Counselor with the California State Department of Rehabilitation, and 24 years working as a Vocational Consultant for the Social Security Administration, Bureau of Hearing and Appeal. He currently operates a private practice where he engages in vocational evaluation, vocational surveys, projecting loss of earning capacity, and rehabilitation counseling.

25. Dr. Hansen issued a Vocational Analysis for purposes of Shindoll's July 1, 2013 appeal. Like Drs. Kippels and Spurlock, Dr. Hansen noted that Shindoll is affected by many cognition problems resulting from her Fibromyalgia and CFS, such as inability to concentrate, inability to communicate concisely, inability to shift priorities quickly, inability to collectively recall and assemble data from responses, confusion from multi-tasking, inability to bring forth information from which she can make a sound decision, heightened emotion and emotional instability, confusion caused by procedural issues and difficulty understanding and following such information, and lowered productivity. Based on these symptoms, and Shindoll's job duties, Dr. Hansen concluded that Shindoll "does not have the vocational ability to continue in the employment she maintained with XO, nor [does he] believe today she is able to engage in any type of employment."

26. As part of the appeal of the March 5, 2015 decision discontinuing benefits, Dr. Hansen issued an addendum to his earlier report. As part of his issuance of the addendum, Dr. Hansen reviewed the July 2, 2015 neuropsychological report by Dr. Nancy Didriksen, medical note by Dr. Spurlock, and Dr. Kippels' affidavit. He also re-interviewed Shindoll on August 3, 2015. Based on this new data considered, Dr. Hansen arrived at the same vocational opinion rendered in his original report: "Ms. Shindoll's condition of Chronic Fatigue Syndrome and Fibromyalgia precludes her from employment within the labor market."

27. In its desperation to discontinue Shindoll's benefits, MoO made a number of pointless and often inaccurate claims concerning Shindoll's condition. For example, MoO suggested that her headaches are attributable to overuse of Advil, caffeine and Tramadol, and that she actually suffers from an anxiety disorder (but conveniently that anxiety does not impair her in any way). First, Shindoll's claim for disability benefits has nothing to do with headaches; they are merely one out

of hundreds of symptoms associated with her underlying conditions. Second, as Dr. Kippels makes clear, Shindoll uses Advil infrequently. Since he began treating Shindoll in 2005, she never consumed an entire bottle of Advil until mid-2012, when her Fibromyalgia symptoms returned and were more severe than ever. Shindoll was prescribed Tramadol when she was diagnosed with Lyme Disease. Even then she did not take all of one full prescription from January of 2013 through the time she met with MoO's Dr. Daniel in September of 2013. At the time of Dr. Daniel's examination, Shindoll was drinking only 1-2 cups of half-decaffeinated coffee per day, and she no longer drinks coffee at all. MoO's position on the cause of Shindoll's headaches is in error.

28. There was also no support for MoO's physician consultant's position that Shindoll suffers from an unspecified anxiety disorder. As Dr. Kippels explained, "[this physician] states that '[Plaintiff] has features of generalized anxiety disorder with anxiety and fatigue and poor concentration, irritability, and trouble sleeping.' While these symptoms may be associated with some anxiety disorders, they are also consistent with a diagnosis of Fibromyalgia and/or CFS. I have never treated Ms. Shindoll for any psychiatric disorder, nor have I ever diagnosed Ms. Shindoll with such an impairment. She has cognitive and physical impairments related to Fibromyalgia and CFS, but not evidence of a psychiatric disorder." This position was supported by Dr. Didriksen as well, who notes "Ms. Shindoll's profile is generally healthy and free of psychopathology, consistent with self-report of utilizing many techniques to manage and reduce stress. … She is usually poised and free of worry, although feelings of self-doubt may occasionally occur." *See* Didriksen Neuropsychological Consultation Report, at P. 19. She also observed, "[concomitant] depression and anxiety is significantly attenuated by her positive outlook and strong social support system." Finally, she noted, "despite illness and disability, she remains positive and optimistic and has implemented several healing modalities including yoga,

meditation, prayer, and others to prevent significant secondary anxiety and depression experienced by the majority of disabled individuals who have been evaluated and treated in this office and reported in the literature."

29. Even though the application definition of "disability" requires only that Plaintiff be prevented from performing at least one of the material duties of her "Regular Occupation," MoO has discontinued her benefits, in part, because she was able to become qualified to teach yoga. This is a red herring, as her ability to amass the requisite number of hours to become certified to teach yoga has nothing to do with her ability to perform the job duties associated with her regular occupation as a Software Applications Engineer, Senior Manager. Moreover, Plaintiff's yoga instructor made special accommodations to allow Plaintiff to attend training, including a flexible schedule and doubling the overall time one is normally expected to complete training. Her training focused on gentle, therapeutic and restorative yoga with a strong emphasis on yoga philosophy. Class was held one weekend a month, and never took a full eight hours. Plaintiff was allowed to take breaks as needed, and reschedule classes she missed on account of her symptoms. Finally, these classes dovetailed with her therapy, as yoga has been part of her wellness strategy since Dr. Kippels recommended it in 2005. Plaintiff is unable to teach yoga because her symptoms are so variable they would not allow her to lead class with any consistency, she cannot recall the information needed to safely lead a class, she could not master the anatomy portion of training, and she is not well enough to satisfy the annual continuing education requirements. Plaintiff would also not be able to earn 99 percent of her basic earnings as a yoga instructor as standard pay for even experienced yoga instructors ranges from $25 to $40 per class, and full-time for yoga instructors is approximately seven classes per week.

30. MoO also takes issue with her prior diagnoses of various bacterial and viral infections, misconstruing the relevance of these conditions. Fibromyalgia is thought to be associated with a complex group of viruses that create multi-system dysfunction. In December of 2012, Shindoll was diagnosed with several of them. Several of these infections can mirror or exacerbate the effects of Fibromyalgia. She is not currently under a diagnosis of any active infectious disease. However, her lab results do support reactivated infections. This being said, Shindoll's current symptomology is related to Fibromyalgia, not to any of these infections. MoO's reference to these infections in its March 5 correspondence is a red herring.

31. In summary, there is ample support for the conclusion that Shindoll cannot perform even sedentary work given her current condition. She has been definitively diagnosed with Fibromyalgia and Chronic Fatigue Syndrome by not one but two qualified physicians who specialize in this field of medicine. Her physical and cognitive deficits are well-documented by both doctors, and her cognitive dysfunction has now been confirmed by Dr. Didriksen. Dr. Hansen, Dr. Didriksen, Dr. Spurlock, Dr. Kippels, and the Social Security Administration uniformly agree that Shindoll is fully disabled and unable to work in any job within the labor market.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

32. By letter dated August 24, 2015, Plaintiff appealed MoO's March 5, 2015 decision discontinuing benefits, bringing the above points and evidence to MoO's attention. On September 16, MoO notified Plaintiff that it would uphold its decision discontinuing disability benefits. Plaintiff has therefore fully exhausted her administrative remedies through the Policy's appeal process.

## V. CAUSE OF ACTION

33. The Policy is an employee benefit plan as defined by ERISA.

34. Plaintiff is a plan participant or beneficiary of the Policy. Defendant is the administrator and/or fiduciary of the Policy.

35. Because of Defendant's conflict of interest as both insurer and administrator of the Policy, Defendant is subject to the "sliding scale" variation of the abuse of discretion standard of review: the greater the evidence of conflict on the part of the administrator, the less deferential the abuse of discretion standard will be. In this case, the only support for MoO's adverse decision is in the form of unsupported opinions from its own physicians.

36. Plaintiff applied for and was awarded benefits under the Policy. Later, Defendant arbitrarily discontinued Plaintiff's benefits.

37. In discontinuing the benefits, Defendant abused its discretion by, for example, ignoring and/or not giving the proper weight to the medical evidence, and relying exclusively on unsupported opinions of its own unqualified physicians rather than Plaintiff's actual treating physicians.

38. Defendant's discontinuation of Plaintiff's benefits entitles Plaintiff to sue for recovery of benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B). Alternatively, Defendant is liable for breach of fiduciary duty under ERISA, 29 U.S.C. § 1109 and § 1132(a)(3). In the further alternative, Defendant is liable for intentional denial of benefits under ERISA, 29 U.S.C. § 1140 and § 1132(a)(3). Plaintiff has suffered damages as a result of Defendant's denial of her claim.

## VI. REQUEST FOR INJUNCTIVE RELIEF

39. Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiff seeks a declaration of her rights under the Policy and a clarification of her rights to future benefits. Specifically, Plaintiff is entitled to

reinstatement of benefits under the Policy and prays that the Court order Defendant to reinstate her and pay benefits so long as she meets the terms and conditions of the Policy.

## VII. ATTORNEY'S FEES

40. It was necessary for Plaintiff to hire the undersigned attorney to protect her rights. Plaintiff is therefore entitled to an award of attorney's fees and costs under ERISA, 29 U.S.C. § 1132(g).

## VIII. PREJUDGMENT AND POSTJUDGMENT INTEREST

41. Plaintiff is entitled to prejudgment and postjudgment interest at the highest lawful rate.

## IX. PRAYER

42. WHEREFORE, Plaintiff prays for judgment against Defendant for the following:

A. Unpaid benefits under the terms of the Policy;

B. An injunction ordering Defendant to reinstate Plaintiff and pay her benefits so long as she meets the terms and conditions of the Policy.

C. Attorney's fees and costs;

D. Prejudgment and post-judgment interest at the highest lawful rate; and

E. Such other and further relief, at law or in equity, to which Plaintiff may show herself justly and lawfully entitled.

Respectfully Submitted,

By: Amanda L. Reichek
Texas Bar No. 24041762

**Cole | Reichek, PLLC**
2911 Turtle Creek Boulevard, Suite 300
Dallas, Texas 75219
(214) 599-8311 (Telephone)
(214) 580-9680 (Facsimile)

**Attorney for Plaintiff**
**Admitted Pro Hac Vice**

**Certificate of Service**

I hereby certify that on February 3, 2016, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following Counsel of Record for Defendants:

c/o     Rick Illmer, Esq.
         Justin E. Allen, Esq.
         Husch Blackwell, LLP
         2001 Ross Avenue, Suite 2000
         Dallas, Texas 75201

                                                   /s/ Amanda L. Reichek
                                                   Amanda L. Reichek